*Lelchook v. Société Générale de Banque au Liban S.A.L.*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2021

(Argued: May 17, 2022     Decided: August 11, 2025)

Docket No. 21-975

ESTER LELCHOOK, AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DAVID
MARTIN LELCHOOK, MICHAEL LELCHOOK, YAEL LELCHOOK, ALEXANDER
LELCHOOK, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE
OF DORIS LELCHOOK, MALKA KUMER, CHANA LIBA KUMER, MIRIAM
ALMACKIES, CHAIM KAPLAN, RIVKA KAPLAN, BRIAN ERDSTEIN, KARENE
ERDSTEIN, MA'AYAN ERDSTEIN, CHAYIM KUMER, NECHAMA KUMER, LAURIE
RAPPEPPORT, MARGALIT RAPPEPORT, THEODORE (TED) GREENBERG, MOREEN
GREENBERG, JARED SAUTER, DVORA CHANA KASZEMACHER, CHAYA
KASZEMACHER ALKAREIF, AVISHAI REUVANE, ELISHEVA ARON, YAIR MOR,
MIKIMI STEINBERG,

*Plaintiffs-Appellants,*

–v.–

SOCIÉTÉ GÉNÉRALE DE BANQUE AU LIBAN S.A.L.,

*Defendant-Appellee.*[*]

B e f o r e :

---

[*] The Clerk of Court is directed to amend the case caption to conform to the above.

RAGGI, WESLEY, and CARNEY, *Circuit Judges*.

———————

Plaintiffs-Appellants are U.S. citizens who were harmed in Hizbollah rocket attacks carried out in Israel in 2006, and the estate and family members of one U.S. citizen who was killed in such an attack. They assert that Defendant-Appellee Société Générale de Banque au Liban S.A.L. ("SGBL") is liable as the successor to non-party Lebanese Canadian Bank ("LCB") for damages stemming from the attacks. Plaintiffs' theories of liability and jurisdiction with regard to SGBL rest on SGBL's acquisition of all of the assets and liabilities of LCB in 2011 in a transaction that was not a formal merger under New York law.

The district court granted SGBL's motion to dismiss for lack of personal jurisdiction. *Lelchook v. Société Générale de Banque au Liban SAL*, No. 19-cv-33, 2021 WL 4931845 (E.D.N.Y. Mar. 31, 2021) ("*Lelchook I*"). It concluded that New York law allows a successor corporation to inherit its predecessor's jurisdictional status only where the two corporate entities had merged in accordance with state law. *Id.* at *2–3; *see* N.Y. Bus. Corp. Law § 901 *et seq.* (describing merger requirements). Without such a merger, the court thought, LCB's jurisdictional status would not transfer to SGBL. *Lelchook I*, 2021 WL 4931845, at *2–3.

On Plaintiffs' appeal of that decision, we first concluded that we could not predict with confidence how the New York Court of Appeals would resolve the jurisdictional question of inheritability on which the district court's decision turned. *Lelchook v. Société Générale de Banque au Liban SAL*, 67 F.4th 69, 71–72 (2d Cir.), *certified question accepted*, 39 N.Y.3d 1146 (2023). We therefore certified the question to that court. *Id.* at 71–72, 88–89. On review, the Court of Appeals clarified that, under New York's long-arm statute, "where an entity acquires all of another entity's liabilities and assets, but does not merge with that entity, it inherits the acquired entity's status for purposes of specific personal jurisdiction." *Lelchook v. Société Générale de Banque au Liban SAL*, 41 N.Y.3d 629, 638–39 (2024).

With the benefit of that decision, we now hold that SGBL is subject to the specific personal jurisdiction of New York courts for purposes of adjudicating the claims presented by Plaintiffs. We further decide that the exercise of that jurisdiction here comports with federal due process principles. Key to our reasoning are the observations first, that SGBL deliberately acquired assets and liabilities of LCB that were generated in New York; second, that it was foreseeable at the time of the acquisition that SGBL would become subject to the exercise of jurisdiction in New York, such that SGBL should reasonably have anticipated that possibility; and finally, that the exercise of specific jurisdiction over SGBL in these circumstances comports with due process because it does not offend traditional notions of fair play and substantial justice. We

2

therefore **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

_____

ROBERT J. TOLCHIN (Gary M. Osen, Michael Radine, Osen LLC, Hackensack, NJ, *also appearing*), The Berkman Law Office, LLC, Brooklyn, NY, *for Plaintiffs-Appellants*.

BRIAN J. LESKE (Michael J. Sullivan, *on the brief*), Ashcroft Law Firm, LLC, Boston, MA, *for Defendant-Appellee*.

_____

CARNEY, *Circuit Judge*:

Plaintiffs-Appellants are U.S. citizens who were harmed in Hizbollah rocket attacks carried out in Israel in 2006, and the estate and family members of one U.S. citizen who was killed in such an attack. They assert that Defendant-Appellee Société Générale de Banque au Liban S.A.L. ("SGBL") is liable as the successor to non-party Lebanese Canadian Bank S.A.L. ("LCB") for damages stemming from the attacks. Plaintiffs' theories of liability and jurisdiction with regard to SGBL rest on SGBL's acquisition of all of the assets and liabilities of LCB in 2011 in a transaction that was not a formal merger under New York law.

The district court granted SGBL's motion to dismiss for lack of personal jurisdiction. *Lelchook v. Société Générale de Banque au Liban SAL*, No. 19-cv-33, 2021 WL 4931845 (E.D.N.Y. Mar. 31, 2021) ("*Lelchook I*"). It concluded that New York law allows a successor corporation to inherit its predecessor's jurisdictional status only where the two corporate entities had merged in accordance with state law. *Id.* at *2–3; *see* N.Y. Bus. Corp. Law § 901 *et seq.* (describing merger requirements). Without such a merger, the

3

court thought, LCB's jurisdictional status would not transfer to SGBL. *Lelchook I*, 2021 WL 4931845, at *2–3.

On Plaintiffs' appeal of that decision, we first concluded that we could not predict with confidence how the New York Court of Appeals would resolve the jurisdictional question of inheritability on which the district court's decision turned. *Lelchook v. Société Générale de Banque au Liban SAL*, 67 F.4th 69, 71–72 (2d Cir.), *certified question accepted*, 39 N.Y.3d 1146 (2023) ("*Lelchook II*"). We therefore certified the question to that court. *Id.* at 71–72, 88–89. On review, the Court of Appeals clarified that, under New York's long-arm statute, "where an entity acquires all of another entity's liabilities and assets, but does not merge with that entity, it inherits the acquired entity's status for purposes of specific personal jurisdiction." *Lelchook v. Société Générale de Banque au Liban SAL*, 41 N.Y.3d 629, 638–39 (2024) ("*Lelchook III*").

With the benefit of that decision, we now hold that SGBL is subject to the specific personal jurisdiction of New York courts for purposes of adjudicating the claims presented by Plaintiffs. We further decide that the exercise of that jurisdiction here comports with federal due process principles. Key to our reasoning are the observations first, that SGBL deliberately acquired assets and liabilities of LCB that were generated in New York; second, that it was foreseeable at the time of the acquisition that SGBL would become subject to the exercise of jurisdiction in New York, such that SGBL should reasonably have anticipated that possibility; and finally, that the exercise of specific jurisdiction over SGBL in these circumstances comports with due process because it does not offend traditional notions of fair play and substantial justice. We therefore **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

4

**BACKGROUND**

## I.     Factual background

We draw the facts from the allegations in Plaintiffs' complaint.[1]

In the summer of 2006, the terrorist organization Hizbollah carried out a series of rocket attacks against civilian population centers in Israel (the "2006 attacks"). As mentioned above, Plaintiffs are 21 U.S. citizens who were harmed in the 2006 attacks, and the estate and family members of a U.S. citizen, David Martin Lelchook, who was killed in one such attack.

Plaintiffs allege that LCB, a corporation organized under Lebanese law and headquartered in Beirut, provided extensive banking services to Hizbollah in the years leading up to the 2006 attacks. They charge that, during that period, LCB entered into a correspondent banking relationship with a bank located in New York, allowing LCB to facilitate transactions in U.S. dollars rather than in other currencies. LCB is further alleged to have repeatedly used the New York correspondent bank, with its help executing millions of dollars' worth of wire transfers that enabled Hizbollah to plan, prepare for, and carry out terrorist attacks around the world. By executing the transactions, LCB "caused, enabled and facilitated" the 2006 attacks, Plaintiffs assert, making it liable to them for damages under the Anti-Terrorism Act of 1990 ("ATA"), as amended in 2016 by the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2331 *et seq.* App'x at 20.

The banking relationship eventually generated litigation against LCB in this Circuit. *See infra* Section II. By 2008, over 90 Hizbollah victims and their families had

---

[1] Except for the complaint's conclusory allegations, which do not bind us, for present purposes we accept as true all of its factual allegations and draw all reasonable inferences in favor of Plaintiffs. *See MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 82 (2d Cir. 2023).

sought damages from LCB in a suit in the Southern District of New York, and by 2010, the victims' lawsuit had reached this Court on review of various novel issues. LCB's legal difficulties deepened in February 2011, when the U.S. Department of the Treasury designated it a financial institution of "primary money laundering concern," citing its involvement with Hizbollah. App'x at 51.

Just a few months after the designation, Defendant SGBL, a Beirut-based private joint stock company organized under Lebanese law, entered into a sweeping "Sale and Purchase" agreement with LCB (the "Agreement"). In return for SGBL's $580 million payment to LCB, LCB agreed to "transfer, convey, and assign" to SGBL, and SGBL agreed to "receive and assume" from LCB, "all of [LCB's] Assets and Liabilities." App'x at 52, 61, 140. The Agreement defined these liabilities broadly:

> The Assumed Liabilities consist *inter alia* of any and all of [LCB's] liabilities and/or obligations and/or debts of any kind, character or description, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, determined, determinable or otherwise, to the extent they relate to the [LCB's] Business, all as at the Completion Date.

App'x at 53, 61.[2] The contemplated transaction closed on June 22, 2011.[3]

Plaintiffs claim that LCB was "an extremely profitable and wealthy entity" when the transaction closed but assert that, today, LCB is "unable to satisfy any judgment

---

[2] In their Appendix, Plaintiffs have provided only a portion of the Agreement's text. We cite to that where possible and to Plaintiffs' allegations of its terms where necessary.

[3] The Agreement did not require or appear to contemplate (so far as the record shows) the formal dissolution of LCB, and it appears that LCB continues to exist in some form. As of 2021, it was still defending litigation in this Court. *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021); *Bartlett v. Société Générale de Banque au Liban SAL*, No. 19-cv-7, 2020 WL 7089448, at *17 (E.D.N.Y. Nov. 25, 2020) ("LCB continues to exist as an entity and is litigating in the *Kaplan* case currently before the Second Circuit.").

against it." Appellants' Br. at 11–12. "SGBL's purchase of LCB's assets" caused the turnabout; otherwise, LCB "would easily have been able to satisfy a judgment" entered in this case, Plaintiffs say. *Id.* at 12. Consistent with Plaintiffs' account, LCB represented to the United States Supreme Court in a February 2017 opposition to a petition for certiorari that LCB "is defunct, insolvent, and unable to pay any judgment rendered against it." Brief in Opposition to Petition for Writ of Certiorari at 4, *Licci v. Lebanese Canadian Bank, SAL*, 584 U.S. 959 (2018) (No. 16-778), 2017 WL 712025, at *4; *see* App'x at 54.

## II.     The *Licci/Kaplan* litigation

This Court has previously heard appeals of several district court decisions addressing claims against LCB related to the 2006 attacks. These claims have been pursued by substantially overlapping groups of plaintiffs in a long-running line of cases that we have referred to as the "*Licci/Kaplan*" litigation. *See Lelchook II*, 67 F.4th at 73 (listing cases). The *Licci/Kaplan* cases, too, involve ATA-rooted claims for damages stemming from the 2006 attacks. Three of our *Licci/Kaplan* decisions, which we discuss briefly below, are relevant here, as is a related 2012 New York Court of Appeals decision.[4]

---

[4] We list them here for easy reference.

- *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50 (2d Cir. 2012) ("*Licci II*")

- *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327 (2012) ("*Licci III*")

- *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013) ("*Licci IV*")

- *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021) ("*Kaplan II*")

In *Licci II*, we considered whether LCB was subject to specific personal jurisdiction in New York for ATA claims related to the 2006 attacks. *See Licci II*, 673 F.3d at 62–63, 74–75. We certified to the New York Court of Appeals questions about the scope of the state long-arm statute, CPLR 302(a)(1), on which Plaintiffs' jurisdictional theory as to LCB relied. *See id.* at 75–76. That court instructed that the "maintenance" and "repeated use of a correspondent account in New York on behalf of a client" constituted a "transaction of business in New York," and this demonstrated an "articulable nexus or substantial relationship between the transaction" and the claims alleged. *Licci III*, 20 N.Y.3d at 338–40. The claims thus "arose from" the transaction of business in New York and permitted courts in New York to exercise specific personal jurisdiction over LCB under CPLR 302(a)(1). *See id.* at 339–41.

With the antecedent state law questions resolved, we concluded in *Licci IV* that the federal district court's exercise of specific personal jurisdiction over LCB in New York on these claims—based on LCB's maintenance and repeated use of its correspondent bank account at a New York financial institution—comported with due process. 732 F.3d at 165.

Thus, by 2013, *Licci II*, *Licci III*, and *Licci IV* had established that LCB was subject to the exercise of specific personal jurisdiction in New York for ATA claims arising from the 2006 attacks. And in 2021, in *Kaplan II*, we held that the plaintiffs in the *Licci/Kaplan* litigation stated a plausible aiding-and-abetting liability claim against LCB under the ATA, as amended by JASTA, 18 U.S.C. § 2333(d)(2). *Kaplan II*, 999 F.3d at 863–67. As we observed in *Lelchook II*, the plaintiffs' aiding-and-abetting allegations in *Kaplan II* "virtually mirror those made" by Plaintiffs here and are offered in support of "materially identical" claims. 67 F.4th at 74.

### III.    Procedural history

In January 2019, Plaintiffs sued SGBL in the U.S. District Court for the Southern District of New York, seeking to hold SGBL as LCB's successor both primarily and secondarily liable for the damages they suffered from the 2006 attacks.[5] They claim that SGBL's unlimited acquisition of LCB's liabilities in the 2011 transaction compels the conclusion that "SGBL assumed and bears successor liability for LCB's liability to . . . [P]laintiffs" here. App'x at 58 (First Amended Complaint).

Plaintiffs' theory of personal jurisdiction, like their theory of liability, depends entirely on SGBL's status as "successor" to LCB and on the *Licci/Kaplan* line of cases. The district court has personal jurisdiction over SGBL, they reason, because our Court "determined that LCB's conduct . . . rendered it subject to personal jurisdiction in the State of New York, and SGBL assumed and bears successor liability for LCB's conduct," *i.e.*, LCB's repeated use of its New York correspondent account to execute transactions on behalf of Hizbollah. App'x at 23.

The district court was not convinced. In early 2020, on SGBL's motion, the court dismissed the case for want of jurisdiction. The court understood New York law to recognize an inherited-jurisdiction theory only upon a statutory or de facto merger of the two entities in question: a transaction that was not a merger would not "suffic[e] to impute a target's jurisdictional status on an acquiror." *Lelchook I*, 2021 WL 4931845, at *2–3.

On appeal (as described above), this panel first determined that we could not confidently predict how the New York Court of Appeals would resolve the threshold

---

[5] Plaintiffs also named several other entities as defendants, but in the First Amended Complaint—operative here— they proceed against only SGBL.

"successor jurisdiction" question. We therefore certified the following two questions to that court:

1. Under New York law, does an entity that acquires all of another entity's liabilities and assets, but does not merge with that entity, inherit the acquired entity's status for purposes of specific personal jurisdiction?

2. In what circumstances will the acquiring entity be subject to specific personal jurisdiction in New York?

*Lelchook II*, 67 F.4th at 71–72. The Court of Appeals answered the first question in the affirmative and found it unnecessary to answer the second. *See Lelchook III*, 41 N.Y.3d at 631.

In addressing the first question, the Court of Appeals identified several relevant factors: the "impact of [the] rule on parties to a potential acquisition"; the "reasonable assumptions and expectations of the parties"; whether imputation of a predecessor's jurisdictional status "induces responsible parties to internalize responsibility for risks"; and the "impact . . . on those injured by a predecessor's acts." *Id.* at 636–37. It concluded that "[t]hose factors tip in favor of allowing successor jurisdiction where a successor," *i.e.*, SGBL, "purchases all assets and liabilities" from the predecessor entity, *i.e.*, LCB. *Id.* at 637–39.

It explained its decision further by observing that "[s]ophisticated corporate entities such as SGBL will undoubtedly engage in robust due diligence before agreeing to acquire all assets and liabilities of another entity," including as to where jurisdiction over actions related to the company's liabilities may lie. *Id.* at 637. The parties can factor into the purchase price the costs associated with such liabilities, avoiding unfairness, it observed. *Id.* And, as a more general policy matter, the rule it stated was consistent with good corporate stewardship because it would avoid a situation in which a successor

acquired all of a predecessor's assets while shielding itself from judgment on certain of the predecessor's related liabilities (which it otherwise purported to assume). *Id.* at 638. That result, in turn, would help to ensure the existence of a responsible entity, available "to absorb the risk of liability and compensate injured parties." *Id.*

We requested supplemental briefing from the parties on the decision's import for this case and on the question whether exercising specific personal jurisdiction over SGBL on Plaintiffs' claims here would comport with due process. We now resolve those questions.

## DISCUSSION

We review *de novo* a district court's decision to dismiss a complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010). On such review, we construe the pleadings in the light most favorable to the plaintiffs. *Id.* To survive a motion to dismiss for lack of personal jurisdiction, "a plaintiff must make a prima facie showing that jurisdiction exists." *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006).

## I.      Principles of specific personal jurisdiction

A district court may exercise specific personal jurisdiction over a defendant only if three requirements are satisfied: "(1) the plaintiff's service of process upon the defendant must have been procedurally proper; (2) there must be a statutory basis for personal jurisdiction that renders such service of process effective; and (3) the exercise of personal jurisdiction must comport with constitutional due process principles." *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56, 69 (2d Cir. 2022) (internal quotation marks omitted); *see also Licci II*, 673 F.3d at 59–60. SGBL does not contest that it was properly served, and so we proceed to examine the second and third requirements.

11

As to the *statutory basis* for personal jurisdiction over SGBL, a non-U.S. entity, we have previously ruled that Plaintiffs' only viable theory rested on Federal Rule of Civil Procedure 4(k)(1)(A). *See Lelchook II*, 67 F.4th at 75 & n.7. That rule, entitled "Territorial Limits of Effective Service," provides that proper service establishes the district court's "personal jurisdiction over a defendant . . . who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1)(A) (internal punctuation omitted). We therefore ask next whether the law of the forum state—here, New York, and in particular the New York long-arm statute—permits the exercise of personal jurisdiction over SGBL in New York. *See Lelchook II*, 67 F.4th at 75; *Licci IV*, 732 F.3d at 168.[6] We conclude that it does: under *Lelchook III*, a company that acquires all of another entity's assets and liabilities inherits that entity's jurisdictional status in cases arising from the acquired liabilities.

We then turn to the question whether the court's exercise of specific personal jurisdiction over SGBL in this case comports with due process. *See Lelchook II*, 67 F.4th at 75–76. Again, as we explain below, we conclude that it does.

## II. Jurisdiction over SGBL under New York's long-arm statute

In *Lelchook III*, the New York Court of Appeals set out a straightforward general rule: "[W]here an entity acquires all of another entity's liabilities and assets, but does not merge with that entity, it inherits the acquired entity's status for purposes of specific personal jurisdiction." 41 N.Y.3d at 638–39. The court reasoned that where the predecessor entity would be subject to specific personal jurisdiction in New York on the

---

[6] We have previously determined that New York's long-arm statute is not co-extensive with the Due Process Clause, and so we address whether it provides for personal jurisdiction over SGBL before ruling on the constitutional question. *See Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 129 (2d Cir. 2022).

claims at issue, subjecting the successor to jurisdiction under the long-arm statute based on the predecessor's contacts was permitted by the statute and would be both fair and reasonable. *Id.* at 636–39.[7]

Applying that rule to the facts at hand easily resolves the state law jurisdictional question before us. As described, SGBL acquired all of LCB's assets and liabilities, without reservation. It therefore "inherit[ed] [LCB's] status for purposes of specific personal jurisdiction." *Id.* LCB's jurisdictional contacts at the time of the purchase are under New York law properly treated as SGBL's own.

As we have described, the claims and contacts alleged in this case as to LCB are "materially identical" to those at issue in the *Licci/Kaplan* litigation, wherein we held LCB is subject to personal jurisdiction in New York. *Lelchook II*, 67 F.4th at 74. Plaintiffs in both cases allege LCB used its New York correspondent account to finance Hizbollah. *Compare Licci IV*, 732 F.3d at 165–66, *with* App'x at 30–32 ¶¶ 44–56, 40 ¶¶ 87–90. And those allegations satisfy the state long-arm statute: they describe a "transaction of business" in New York, which Plaintiffs' claims "aris[e] from." *Licci IV*, 732 F.3d at 168–69; *see* CPLR 302(a)(1); *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 129–31 (2d Cir. 2022) (describing the uses of a correspondent bank account that support jurisdiction under New York's long-arm statute). Because LCB would be subject to personal jurisdiction on those claims in a New York court, Plaintiffs have made a prima facie showing that SGBL too is amenable to personal jurisdiction in New York on those claims pursuant to the state long-arm statute. *Licci IV*, 732 F.3d at 169.

---

[7] The Court of Appeals further observed that New York is not an outlier in adopting this approach: rather, its decision "accords with nearly all decisions of other state appellate courts and federal circuit courts that have considered the issue of successor jurisdiction." *Lelchook III*, 41 N.Y.3d at 639 n.3.

13

SGBL argues, however, in what it acknowledges to be a "counterintuitive" formulation, that the rule laid out by the New York Court of Appeals actually leads to the contrary conclusion: that a New York court would *not* exercise long-arm jurisdiction over SGBL. SGBL Letter Br. at 1 (Dkt. No. 89); *see also id.* at 3–5. A New York court would lack jurisdiction, it urges, because the "underlying justifications" for the rule that the New York Court of Appeals articulated are lacking here. *Id.* at 3.

SGBL contends, for example, that Plaintiffs could pursue assets of LCB in New York—the roughly $580 million consideration that SGBL paid to LCB for its assets and liabilities—thus negating any need for courts to apply the idea of inherited jurisdiction over these claims. But the state high court rejected this very argument when it explained that there was "no good reason" to mandate that plaintiffs proceeding against a successor "take an indirect and uncertain path to recompense" against the (perhaps insolvent) predecessor. *Lelchook III*, 41 N.Y.3d at 638.

SGBL similarly attempts to disavow having received any benefit from LCB's New York business, attempting to undercut that part of the Court of Appeals' rationale, too.[8] *See* SGBL Letter Br. at 5. But the Agreement shows that, together with LCB's liabilities, SGBL acquired *all* of LCB's then-listed assets. It does not exclude those assets that were derived from the use of the New York correspondent account—or of any other asset group, for that matter. Accordingly, we reject this argument. *See Lelchook III*, 41 N.Y.3d at 638.

---

[8] It asserts relatedly that LCB is not in fact "defunct," pointing simply to LCB's continuing litigation in this Circuit. SGBL Letter Br. at 4. But this is in effect an invitation to discount Plaintiffs' plausible allegations on the subject. On review of a motion to dismiss, we are not at liberty to do so.

In sum, these and SGBL's other contentions on successor jurisdiction under New York law are squarely defeated by the state court's ruling.

### III. Fourteenth Amendment due process limits on jurisdiction over SGBL

With the state law jurisdictional question resolved, we turn to the bottom line: whether a U.S. district court's exercise of specific personal jurisdiction over SGBL in New York, based on the contacts SGBL inherited from LCB, comports with Fourteenth Amendment due process principles.[9]

Where New York's long-arm statute permits the exercise of jurisdiction over the parties, we have not generally "suggested that due process requires something more than New York law." *Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 645 (2d Cir. 2023) (footnote omitted).[10] Still, we "independently ensure that the constitutional requirements are satisfied." *Id.*

A court's exercise of personal jurisdiction over a person or entity is bound by the Constitution's guarantee of due process. The law of due process governing the exercise of jurisdiction over corporate entities has undergone significant developments in recent decades. *See, e.g.*, *Daimler AG v. Bauman*, 571 U.S. 117 (2014); *Bristol-Myers Squibb Co. v. Superior Ct. of California*, 582 U.S. 255 (2017). But the seminal principle has not changed:

---

[9] The Supreme Court recently held that the Due Process Clause of the Fifth Amendment and Due Process Clause of the Fourteenth Amendment are not of equal reach, and expressly "declin[ed] to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment." *Fuld v. Palestine Liberation Org.*, 606 U.S. __, 145 S. Ct. 2090, 2105 (2025). The familiar Fourteenth Amendment analysis continues to apply, however, where state law binds a federal court in determining the bounds of its jurisdiction over persons as it does under Rule 4(k)(1)(A), applicable here. *See id.* at 2102.

[10] *See also Licci IV*, 732 F.3d at 170 (noting that CPLR 302(a)(1) is "not coextensive" with due process while remarking that a case would be "rare" in which contacts satisfy the statute yet fail to comport with due process).

15

where the Fourteenth Amendment's protections apply, "a tribunal's authority depends on the defendant's having such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable . . .' and 'does not offend traditional notions of fair play and substantial justice.'" *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945)).

To exercise specific personal jurisdiction over a corporate defendant that is not incorporated in or primarily doing business in the State, a court must first determine that a corporate defendant's in-state acts reflect its "purposeful availment" of opportunities within the State, and that the asserted claims arise out of or relate to its contacts with the State.[11] *Id.* at 359; *see also Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 138 (2023) (plurality); *Fuld v. Palestine Liberation Org.*, 606 U.S. \_\_, 145 S. Ct. 2090, 2102–03 (2025). The corporate defendant's in-state acts must further make it reasonably foreseeable that it would be subject to suit in courts sitting in that State. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98 (1980); *Licci IV*, 732 F.3d at 170; *Spetner*, 70 F.4th at 645. In other words, it must receive "fair warning" that it might be called to answer claims in the forum. *Ford Motor Co.*, 592 U.S. at 360; *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). The exercise of jurisdiction in the State as to the related claims over the defendant must be "reasonable"—that is, consistent with "traditional notions of fair play and substantial justice" that the Court referred to in *International Shoe*. *See Licci IV*, 732 F.3d at 169–70, 174.

---

[11] In contrast, general jurisdiction over a corporate defendant may be exercised in a State where the corporation has continuous and systematic contacts so extensive as to render it "essentially at home"—*i.e.*, in its state of incorporation or its principal place of business. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *see, e.g., Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 629 (2d Cir. 2016). Those deep contacts subject it to jurisdiction by a court in that forum for any claims at all. *See Goodyear Dunlop Tires Operations*, 564 U.S. at 919.

On review of these factors here, we conclude that Plaintiffs have stated a prima facie case for the exercise of specific personal jurisdiction over SBGL in New York: their allegations satisfy the governing standards at each step of the specific jurisdiction analysis. SGBL's motion to dismiss under Rule 12(b)(2) for want of personal jurisdiction thus fails. *See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84–85 (2d Cir. 2013) (per curiam). We set forth our reasoning below.

A.    <u>Minimum contacts: "purposeful availment" of the forum</u>

As described above, Plaintiffs proceed solely on a successor theory of jurisdiction. State and federal courts alike have consistently permitted the jurisdictional contacts of a predecessor to be imputed to its successor, reasoning that if forum law could also hold the successor liable for its predecessor's actions, its related jurisdictional actions should also attach to the successor. *See, e.g., Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 (10th Cir. 1991) ("A corporation's contacts . . . may be imputed to its successor if forum law would hold the successor liable for the actions of its predecessor."); *State ex rel. Stein v. E.I. du Pont de Nemours & Co.*, 382 N.C. 549, 557–60 (2022) (holding a predecessor corporation's contacts may be imputed to a successor for jurisdictional purposes when forum law would hold the successor liable for its predecessor's actions (referencing *City of Richmond v. Madison Mgmt. Grp., Inc.*, 918 F.2d 438, 454 (4th Cir. 1990))); *Ostrem v. Prideco Secure Loan Fund, LP*, 841 N.W.2d 882, 896 (Iowa 2014) ("[C]ourts commonly impute a corporate predecessor's contacts to its successor in order to exercise personal jurisdiction over the successor.") (collecting cases).

We agree with these courts' analysis and apply it here. As part of the Agreement, SGBL agreed to assume, without qualification, "any and all of [LCB's] liabilities and/or obligations." App'x at 53, 61. Although the Court of Appeals recognized that "liability and jurisdiction are distinct legal concepts," *Lelchook III*, 41 N.Y.3d at 635, it also said

17

that the jurisdictional analysis under New York law is "inform[ed]," if not determined, by the substantive question of successor liability, *id.* at 635. In light of this substantial overlap, we read *Lelchook III* as concluding that, taking Plaintiffs' allegations as true, SGBL could be liable under New York law for LCB's acts as a result of the Agreement. *See id.* at 637–38 (reasoning that SGBL should have "anticipated being subject to jurisdiction over LCB's liabilities in New York" because "the great weight of authority at the time [of the Agreement] permitted imputation whenever the forum state's law would hold the successor liable" (internal quotation marks omitted, alterations adopted)). Accordingly, because Plaintiffs have alleged sufficient facts to establish successor liability under New York law, we impute LCB's forum contacts to SGBL for purposes of our personal jurisdiction analysis.[12]

> 1. *SGBL reached out to acquire the fruits of LCB's business transactions in New York, purposefully availing itself of the forum*

LCB, if still viable, would be subject to specific personal jurisdiction in New York in an action on Plaintiffs' claims. In its supplemental briefing, SGBL does not appear to dispute this proposition. Rather, it seeks to distance itself from LCB, taking the view that it "(as opposed to third-party LCB) has no contacts with the forum," and urging that New York courts cannot exercise specific jurisdiction over it notwithstanding the assets and liabilities it acquired. SGBL Letter Br. at 6–7. It denies any "purposeful availment" of the state of New York of its own. But this argument both mischaracterizes the nature of SGBL's acquisition of LCB's liabilities and ignores that SGBL benefited from LCB's activities in New York when it acquired LCB's assets.

---

[12] Because this appeal is from the district court's order on SGBL's motion to dismiss for lack of personal jurisdiction under New York law, we do not address the adequacy of Plaintiffs' federal claims under the ATA or JASTA. Nor do we express any view regarding the merits of SGBL's Rule 12(b)(6) motion.

LCB's use of the correspondent bank in New York was an activity *"purposefully directed toward the forum State." Asahi Metal Indus. Co. v. Superior Ct. of California*, 480 U.S. 102, 112 (1987) (emphasis in original). LCB's deliberate and recurring use of that correspondent bank is reasonably seen as a form of "exploit[ation of] a State's market," the paradigmatic example of "purposeful availment." *Ford Motor Co.*, 592 U.S. at 359, 364 (internal quotation marks omitted, alterations adopted); *see Licci IV*, 732 F.3d at 170–172. LCB's repeated reliance on New York banking services "indicates desirability" of the state's banking system "and a lack of coincidence" in LCB's usage of that system. *Licci III*, 20 N.Y.3d at 340 (explaining analogous portion of the state long-arm statute inquiry). LCB's selection of that correspondent bank as opposed to another intermediary (as the New York Court of Appeals observed) was likely "cheaper and easier for LCB." *Id.* It conferred "financial and other benefits" that allowed LCB to retain those customers who sought the alleged monetary transfers. *Id.* As we observed earlier, LCB benefitted from the U.S. dollar's "stable and fungible" nature; from New York's "dependable and transparent" banking system; and from the "predictable jurisdictional and commercial" law of the state. *Licci IV*, 732 F.3d at 171. This made LCB susceptible to the New York court's jurisdiction on claims like those raised here, arising out of its use of that correspondent account. *See id.* at 170–73.

Under the Agreement, SGBL obtained the fruits of *all* of LCB's business, including its transactions in New York. Few courts have considered whether, in similar circumstances, a corporate successor is subject to jurisdiction that would properly have been exercised over its predecessor. Those that have addressed the issue have held that it is: where a predecessor "purposefully avail[ed] itself of the privilege of exploiting forum-based business opportunities," the successor's "express assumption of liability" constitutes a "deliberate undertaking" that "amounts to a purposeful availment of [the in-state] opportunities" exploited by the predecessor. *Jeffrey v. Rapid Am. Corp.*, 448

19

Mich. 178, 187, 198–99 (1995); *see Perry Drug Stores v. CSK Auto Corp.*, 93 F. App'x 677, 681 (6th Cir. 2003) (summary order) (referencing *Jeffrey*, 448 Mich. at 198–99); *Simmers v. Am. Cyanamid Corp.*, 394 Pa. Super. 464, 489–90 (1990) (holding successor jurisdiction proper in part on ground that it would be "absurd" to deny jurisdiction where "the assets purchased by the successor, at least in part, were derived from the forum"). Entering into the Agreement represented SGBL's choice to obtain LCB's assets and to answer for LCB's activities; that choice properly forms the basis for a court to impute LCB's contacts to SGBL. *Cf. Burger King*, 471 U.S. at 479–80 (upholding exercise of specific jurisdiction over defendants who purposefully "reach[ed] out beyond" their State by entering a contractual relationship that "envisioned continuing and wide-reaching contacts" in the forum and that contractual relationship gave rise to the suit (alteration in original)).

That SGBL acquired those contacts through its transaction with LCB, rather than directly, does not make the exercise of jurisdiction in New York improper. In a somewhat different context, we have recognized that the actions of a third party can properly support the exercise of specific jurisdiction over a defendant where the defendant's exploitation of forum opportunities through that third party is intentional. *See, e.g., Oklahoma Firefighters Pension & Ret. Sys. v. Banco Santander (México) S.A. Institución de Banca Multiple*, 92 F.4th 450, 457–58 (2d Cir. 2024) (permitting imputation of brokers' contacts to defendant and noting that "a defendant can also avail itself of a forum" absent a formal agency relationship); *Spetner*, 70 F.4th at 645. The same principle applies here and makes specific personal jurisdiction over SGBL consistent with due process.

Resisting the exercise of jurisdiction, SGBL points to the Supreme Court's general statement that it has "consistently rejected . . . attempts to satisfy the . . . 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and

the forum state." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984)). *See* SGBL Letter Br. at 6. SGBL urges that LCB's activities are such "third party" contacts that are impermissibly ascribed to it, relying on a trio of Supreme Court cases. *Id.* at 6–7 (citing *Walden*, 571 U.S. at 284; *World-Wide Volkswagen*, 444 U.S. at 291–92; and *Hanson v. Denckla*, 357 U.S. 235, 253–54 (1958)). But it misunderstands these cases. Each holds that a plaintiff or a third party's "*unilateral* activity" may not form the sole basis for a forum state's exercise of specific personal jurisdiction over a defendant, as we explain in the margin. *Walden*, 571 U.S. at 286 (emphasis added).[13] In all three, and different from the circumstances before us, no

---

[13] First, in *Hanson*, the Supreme Court concluded that a Florida court could not exercise specific personal jurisdiction over a corporate trustee based in Delaware when the jurisdictional claim rested "solely on the contacts of the trust's settlor," a Florida domiciliary who executed powers of appointment in Florida. *Walden*, 571 U.S. at 284 (describing *Hanson*, 357 U.S. at 253–54). Earlier, when the corporate trustee and the settlor executed the trust, the settlor resided in Pennsylvania. *Hanson*, 357 U.S. at 252. The defendant trust company "transact[ed] no business" in Florida and, so far as the record showed, it had never even solicited business there. *Id.* at 251. "The first relationship Florida had to the agreement" was initiated unilaterally by the settlor "years later" when she moved to the state. *Id.* at 251–52.

Similarly, in *World-Wide Volkswagen*, due process barred Oklahoma courts from exercising personal jurisdiction over an automobile distributor operating in New York, New Jersey, and Connecticut, when jurisdiction was asserted based only on an automobile purchaser's travel on Oklahoma highways, where they "happened to suffer an accident while passing through."444 U.S. at 295.

Most recently, in *Walden*, the Supreme Court held that a federal district court in Nevada could not exercise specific personal jurisdiction over a defendant police officer residing in Georgia. The police officer was alleged to have seized cash from the plaintiffs while they stopped at the Atlanta airport on their way to their part-time residence in Nevada. *Walden*, 571 U.S. at 279–81, 288–89. He then helped draft a false affidavit in support of the forfeiture claim to the cash. *Id.* But the *officer's* acts "formed no jurisdictionally relevant contacts with Nevada." *Id.* at 289. It was instead only plaintiffs' Nevada residence and their Nevada destination while in the Atlanta airport that formed the defendant's only connection to the state. *Id.* at 280, 288–89.

act on the defendant's part determined that it would be subject to putative liability in the forum chosen by the plaintiff.

SGBL's summons to a New York-based court to answer Plaintiffs' claims is attributable neither to serendipity nor to Plaintiffs' will. Unlike the defendants in *Hanson*, *World-Wide Volkswagen*, and *Walden*, SGBL was able to assess its transaction with LCB *before* assuming LCB's liabilities, and it was able to assess "where jurisdiction over such liabilities may lie." *Lelchook III*, 41 N.Y.3d at 637; *see also Simmers*, 394 Pa. Super. at 490 ("[I]n today's sophisticated world of corporate takeovers, a corporation[] [that] assumes another's liabilities . . . considers the possible extent of any liabilities and where those liabilities may exist."). The potential reach of LCB's liabilities, and its jurisdictional contacts, were known to SGBL at that time. SGBL cannot now reasonably urge that due process bars subjecting it to specific personal jurisdiction based on LCB's conduct, which generated the very assets and liabilities that it purchased. *See* SGBL Letter Br. at 7.

> 2. *In 2011, when SGBL entered into the Agreement, the legal landscape made it foreseeable that its acquisition would render it subject to the exercise of specific personal jurisdiction in New York*

As we have said, due process requires "that the defendant's conduct and connection with the forum State [be] such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen*, 444 U.S. at 297. SGBL contends that this requirement is not met here.[14] It cites the legal questions raised in the *Licci*/*Kaplan*

---

[14] SGBL's related point that foreseeability alone does not suffice for the exercise of jurisdiction is, of course, beyond dispute. *See* SGBL Letter Br. at 8–9. But that general point offers no support for SGBL's position. Plaintiffs' jurisdictional theory is not exclusively grounded in foreseeability: it also relies on SGBL's acquisition of LCB's liabilities. *See id.* at 9. And foreseeability is not *irrelevant* to personal jurisdiction. Rather, it is a necessary element of the due process analysis for a corporate defendant. *See World-Wide Volkswagen*, 444 U.S. at 297 ("[It

litigation, as well as in this case, that had yet to be answered definitively in 2011 when it made its purchase and argues that the pendency of those questions made the exercise of jurisdiction over it unforeseeable. SGBL Letter Br. at 11–12. We disagree.

Certainty of result is not necessary to establish the reasonable foreseeability that due process requires to support specific personal jurisdiction. The defendant needs only "fair warning" that it may be subject to the state's authority. *Bensmiller v. E.I. Dupont de Nemours & Co.*, 47 F.3d 79, 85 (2d Cir. 1995); *see also World-Wide Volkswagen*, 444 U.S. at 297; *Ford Motor Co.*, 592 U.S. at 360. SGBL had that fair warning. As the Fourth Circuit wrote as early as 1990, holding a successor subject to personal jurisdiction based on the actions of its predecessor, the "great weight" of authority existing even then permitted "imputation of a predecessor's actions" to its successor "*whenever* forum law would hold the successor liable for its predecessor's actions." *Madison Mgmt. Grp.* 918 F.2d at 454 (internal quotation marks omitted, emphasis in original) (citing cases). SGBL does not point to a single federal appellate or state high court decision issued before 2011 or since that rejects this successor-jurisdiction analysis.[15]

---

is] critical to due process" that the defendant "should reasonably anticipate being haled into court" in the forum.); *Licci IV*, 732 F.3d at 171–72.

[15] Some courts have framed successor jurisdiction in part as a matter of consent. *See Stein*, 382 N.C. at 559 ("[W]hen a successor corporation assumes the liabilities of its corporate predecessors, the successor in effect consents to be held liable in the same locations where its predecessor would have been exposed." (quoting *Simmers*, 394 Pa. Super. at 490)); *Jeffrey*, 448 Mich. at 194 (same); *cf. Mallory*, 600 U.S. at 138 (plurality) ("[A]ll *International Shoe* did was stake out an additional road to jurisdiction over out-of-state corporations. . . . Our precedents have recognized, too, that 'express or implied consent' can continue to ground personal jurisdiction—and consent may be manifested in various ways by word or deed." (citations omitted)). That rubric could offer a persuasive way of understanding an express assumption of assets and unlimited liabilities, we agree. But Plaintiffs here did not advance a consent theory of specific personal jurisdiction, and so we will not examine it further.

As to the claims asserted and their relationship to LCB's contacts in New York, first, the possibility of ATA liability for LCB was apparent at the time of the Agreement. By the time SGBL acquired LCB's assets and liabilities in June 2011, the Treasury Department had designated LCB a "primary money laundering concern." App'x at 51 ¶ 117. The *Licci* litigation had begun, based on allegations of LCB's repeated, deliberate use of its New York bank correspondent account to support Hizbollah; indeed, it was already the subject of an appeal to this Court. *See Licci IV*, 732 F.3d at 166–68. When a successor company adopts liabilities that are "no secret" and for which the predecessor has already been subject to public legal battles, the successor has ample notice that it might become liable "in any venue" where liability accrued. *Stein*, 382 N.C. at 563. When it acquired LCB's assets and liabilities, SGBL thus had fair warning that LCB's contacts in New York might subject it to suit there for ATA claims related to LCB's alleged support for and facilitation of Hizbollah's terrorist acts.[16]

SGBL further denies that it was reasonably foreseeable that it would be subject to suit in New York based on a theory of secondary liability under JASTA. It observes that Plaintiffs' secondary liability claims were not viable until 2016, when JASTA was enacted to include aiding-and-abetting liability for terrorist acts under the ATA. *See* JASTA, Pub. L. No. 114-222, § 4(d), 130 Stat. 852, 854 (2016) (codified at 18 U.S.C. §

---

[16] For the same reason, we reject SGBL's other attempts to narrow the applicability of New York's successor liability rule—for instance, its argument that specific jurisdiction might be properly limited to circumstances in which the "underlying lawsuit for which a plaintiff seeks to hold an entity liable on a successor theory . . . is pending in New York at the time of the asset-and-liability purchase." SGBL Letter Br. at 7.

2333(d)).[17] It therefore could not reasonably have known when it entered the Agreement in 2011, it asserts, that LCB would be vulnerable to aiding-and-abetting claims.

It is true that "[a] plaintiff must establish the court's jurisdiction with respect to each claim asserted," and we therefore must consider both whether the court had jurisdiction to hear the Plaintiffs' primary liability claims against SGBL (under the ATA) and their secondary liability claims (under JASTA). *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 83 (2d Cir. 2018) (internal quotation marks omitted). But the court's exercise of specific personal jurisdiction over SGBL on the secondary liability claims, too, satisfies due process. It is enough that (1) the claims "arise out of or relate to [LCB's imputed] contacts with the forum," *Ford Motor Co.*, 592 U.S. at 359 (internal quotation marks omitted), as Plaintiffs' aiding-and-abetting claims do; (2) SGBL could reasonably anticipate being subjected to ATA-related liability in New York based on LCB's alleged in-forum conduct and affiliation with Hizbollah; and (3) SGBL, in the Agreement, assumed the assets and liabilities of LCB—and thus its contacts. *See* App'x at 53 ¶ 126, 61 (specifying liabilities "of any kind," "determined, determinable or otherwise"). In these circumstances, due process does not require that SGBL be allowed to invoke a putative jurisdictional barrier and avoid one set of LCB's potential liabilities.[18]

---

[17] In JASTA, Congress made these ATA amendments retroactively available to a plaintiff in any action pending when, or filed after, it enacted JASTA. *See* JASTA, Pub. L. No. 114-222, § 7, 130 Stat. 852, 855 (2016).

[18] SGBL urges that Plaintiffs' claims lack the "connection between the forum and the specific claims at issue" necessary for specific personal jurisdiction, as identified in *Bristol-Myers Squibb v. Superior Ct. of California*, 582 U.S. 255, 265 (2017). It suggests that the suit therefore does not arise from or relate to LCB's New York contacts. SGBL Letter Br. 14–15. It emphasizes that Plaintiffs are not New York residents; that they did not suffer harm in New York; and its view that the conduct complained of did not "occur" in New York. *Id.* But this argument is squarely foreclosed by *Licci IV*. There, we held that the requisite "affiliation between the forum and the underlying controversy" existed where a bank "deliberate[ly] and recurring[ly]" uses a New York correspondent relationship to execute the transactions that gave rise to the claims. *Licci IV*,

B.   Reasonableness factors: traditional notions of fair play and substantial justice

In addition to satisfying the "minimum contacts" and "relatedness" requirements, the exercise of jurisdiction over a defendant must "comport with fair play and substantial justice." *Licci IV*, 732 F.3d at 170 (quoting *Burger King*, 471 U.S. at 476). To determine whether this requirement is satisfied, we consider the following factors: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest . . . in furthering substantive social policies." *Am. Girl, LLC v. Zembrka*, 118 F.4th 271, 279 (2d Cir. 2024), *cert. denied sub nom. Zembrka v. Am. Girl, LLC.*, 145 S. Ct. 1130 (2025). It is only in an "exceptional situation" will we find the exercise of specific personal jurisdiction "unreasonable" once minimum contacts and the claims' relationship to the forum are sufficiently established. *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 274 (2d Cir. 2023), *cert. denied sub nom. BASF Metals Ltd. v. KPFF Inv., Inc.*, 144 S. Ct. 681 (2024).

On review, we conclude that these reasonableness factors readily permit the court's exercise of specific personal jurisdiction over SGBL here.

*1. The burden on the defendant*

We have no doubt that, as SGBL complains, the burden on it to litigate in New York may be significant. SGBL is based in Lebanon; the 2006 attacks occurred in Israel;

---

732 F.3d at 170–73; *see also Spetner*, 70 F.4th at 645–46 (use of correspondent was "sufficiently related" to injuries because the account "was an instrument to achieve the very wrong alleged" where funds transferred supported terrorist activity (internal quotation marks omitted)). The place of Plaintiffs' residence does not change this conclusion. *See Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 779–81 (1984).

and Plaintiffs, all but one of whom are American citizens, live outside of New York, and indeed, outside of the United States. As a result, "many of the documents and witnesses relevant to this litigation are located abroad." *Licci IV*, 732 F.3d at 174. This factor plainly cuts in SGBL's favor.

Still, we conclude that this burden is a manageable one. As we have said before, "the conveniences of modern communication and transportation ease any burden the defense of this case in New York might impose on [SGBL]." *Id.* (internal quotation marks omitted). The company's required appearance in New York would not place on it an insurmountable or even undue burden.

### 2. *The interests of the forum state*

While the attacks that caused harm occurred in Israel, not in New York, Plaintiffs' claims against SGBL stem from its predecessor's "use of a correspondent account [in New York] to support a terrorist organization." *Id.* As a result, and as has we have earlier recognized, the suit implicates "the United States' and New York's interest in monitoring banks and banking activity to ensure that its system is not used as an instrument in support of terrorism, money laundering, or other nefarious ends." *Id.*; *see also Spetner*, 70 F.4th at 646 (recognizing that the forum's interest in monitoring bank activity may be "heightened" when a nesting set of correspondent accounts is used to shield a bank's identity); *Am. Girl*, 118 F.4th at 280 (recognizing New York's "exceptionally strong interest" in protecting businesses in the state from unlawful foreign activity). This factor cuts in favor of exercising jurisdiction in New York over SGBL on these claims.

### 3. *Plaintiffs' interest in convenient and effective relief*

It is evident that Plaintiffs would likely struggle to "obtain[] convenient and effective relief" in the absence of the New York federal court's exercise of jurisdiction in

this case. *Licci IV*, 732 F.3d at 170. The record before us suggests that LCB has not been dissolved—at least for the purpose of actively litigating the many suits brought against it. But, as mentioned above, the company stated in 2017 that it was "defunct, insolvent, and unable to pay any judgment rendered against it." Brief in Opposition to Petition for Writ of Certiorari at 4, *Licci v. Lebanese Canadian Bank, SAL*, 584 U.S. 959 (2018) (No. 16-778), 2017 WL 712025, at *4. The record provides little basis to conclude otherwise.[19] If so, Plaintiffs have at best remote—and likely illusory—prospects of success in receiving redress from LCB.

Relatedly, and as observed above in connection with the general rule of successor liability, a holding in SGBL's favor on its jurisdictional defense would both enable and incentivize companies to pass their assets on to successors in other jurisdictions and "shield[] [them] from direct claims for . . . liabilities in that forum." *Lelchook III*, 41 N.Y.3d at 638. Plaintiffs would need "to directly sue the successor in a forum that may . . . be less favorable," reducing the value of their claims and requiring they "absorb those costs themselves." *Id.* That would be a particularly concerning outcome in this case, where SGBL has not even tried to demonstrate that Plaintiffs would be able to seek, never mind obtain, the relief they request in Lebanon, SGBL's place of incorporation and principal place of business. Denying jurisdiction would harm Plaintiffs' reasonable interests in pursuing effective relief. *See Fuld*, 145 S. Ct. at 2107 (acknowledging, in *dicta*, the "strong interest" of U.S. citizen plaintiffs in "seeking justice through an ATA damages action in U.S. courts").

---

[19] As alleged in the operative complaint, LCB obtained $580 million in exchange for its assets and liabilities. The record does not show what has happened to these funds. In the procedural posture of this case, we must credit Plaintiffs' allegation that, despite the large payment, LCB is now defunct and unable to satisfy a judgment against it on these claims.

#### 4. *International comity; efficient administration of justice; fairness*

SGBL urges next that "considerations of international rapport and comity" counsel against the exercised of specific personal jurisdiction here, as do concerns about the efficient administration of justice. SGBL Letter Br. at 13 (internal quotation marks omitted, alterations adopted). These arguments fail to persuade us. Our decisions suggest that these concerns, explored by the Supreme Court in *Daimler v. Bauman*, 571 U.S. 117 (2014), are most salient when a court attempts to subject a foreign entity to the *general* jurisdiction of a state. *See In re Platinum & Palladium Antitrust Litig.*, 61 F.4th at 274. Undoubtedly, international rapport may suffer when a court in one sovereign jurisdiction takes an unjustifiably expansive view of its *general* jurisdiction over foreign entities. But "[t]he international rapport concerns of *Daimler* do not apply equally in a case . . . that involves specific jurisdiction." *Id.* For that reason, the alarming specters that SGBL invokes—premised on the concept that permitting specific personal jurisdiction here will, for example, discourage foreign investment in the United States and harm foreign and interstate commerce—have no traction. *See* SGBL Letter Br. at 13–14. A court's exercise of specific personal jurisdiction on claims that are among voluntarily acquired liabilities is hardly "unduly expansive and unpredictable." *See id.* at 13.

Nor is SGBL correct in claiming that judicial efficiency concerns should foreclose the exercise of specific personal jurisdiction here. *See* SGBL Letter Br. at 13–14. It complains that the possible inconvenient location of witnesses and of evidence will impair judicial efficiency as well as burden SGBL as a litigant. *Id.* at 13. But, as explained above, these concerns are adequately abated by modern technology.

And although SGBL also emphasizes its view that it is "simply unfair" to force the company "to litigate Plaintiffs' claims almost ten years after the transaction (and 15 years after their alleged injuries)," SGBL Letter Br. at 14, legislative bodies in the United

States have adopted lengthy statutes of limitations in terrorism cases to help enable victims to recover damages from responsible parties. *See* 18 U.S.C. § 2335(a) (establishing 10-year limitations period under the ATA). In these circumstances, allowing the case to proceed hardly strikes us as unfair. Rather, we agree with Plaintiffs that it would be a truly unfair outcome and would hinder the efficient administration of justice to deny them a New York forum in the circumstances presented here. And in our view, due process presents no bar.

### 5. Policy considerations

Finally, SGBL insists that LCB's contacts cannot be imputed to it for personal jurisdiction purposes because the two banks are not "one" or "the same entity," as in the case of statutory mergers, de facto mergers, parent-subsidiary relationships, or corporate reorganizations. *See* SGBL Letter Br. at 9–11.[20] In essence, it asks us to create a rule denying specific personal jurisdiction over a successor entity if the successor and predecessor are not effectively one another's alter egos.

Such a rule would require the Court to close its eyes to the reality of the relationship between these two banks. But "for personal jurisdiction, we look through form to substance." *Oklahoma Firefighters Pension & Ret. Sys.*, 92 F.4th at 456–57. Although LCB still formally exists as a separate entity, SGBL's acquisition resembles a merger in key respects.[21] As this Court has previously explained, "a distinguishing feature" between "a merger" and a simple asset purchase is that, under the former, the merged entity "is subject to all the liabilities of the acquired companies." *U.S. Bank Nat'l*

---

[20] SGBL does not present the arguments discussed here as matters of "policy" in its letter brief, *see* SGBL Letter Br. at 14, but these are policy arguments, no matter how framed.

[21] We note, indeed, that the record excerpt of the Agreement provides that it was entered into under the "Facilitating Bank Merger" law of Lebanon, a fact that the parties have neither highlighted nor explained. App'x at 61.

*Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 155–56 (2d Cir. 2019) (quoting James D. Cox & Thomas Lee Hazen, 4 Treatise on the Law of Corporations § 22:8). That is no distinction here, however, where SGBL expressly acquired all of LCB's liabilities.

As courts applying successor liability theories have described, allowing specific personal jurisdiction in this setting helps to prevent abuse of the corporate form by wrongdoers and helps maintain legitimate avenues of recourse for plaintiffs. *See Ostrem*, 841 N.W.2d at 897 (warning against a rule that would allow "corporations and other entities . . . to shirk liability by switching names"); *Stein*, 382 N.C. at 560 (same); *Jeffrey*, 448 Mich. at 195 (same); *Lelchook III*, 41 N.Y.3d at 638. LCB is a distinct legal entity, true. But that separate identity provides cold comfort to Plaintiffs if LCB is judgment-proof, as they allege. As the New York Court of Appeals observed, it makes little sense to require Plaintiffs to jump through the hoops of suing SGBL outside the United States when SGBL voluntarily undertook liabilities that LCB created in this forum. *See Lelchook III*, 41 N.Y.3d at 638 (expressing concern against "'catch me if you can' gamesmanship," if Plaintiff's sole remedy is to sue SGBL in other jurisdictions).

SGBL presses further that permitting successor liability is unnecessary, because a fraudulent asset-and-liability purchase "may constitute fraud within or on the State of New York," which would independently constitute a forum contact; therefore, it reasons, a bright line rule would not allow bad actors to exploit a ruling that denies jurisdiction here. SGBL Letter Br. at 7–8. But still, as described, such a ruling would leave Plaintiffs with a less favorable forum, an additional burden of showing fraud, and claims "perhaps . . . significant[ly]" reduced in value. *Lelchook III*, 41 N.Y.3d at 638. If we were to hold for SGBL, a predecessor facing substantial liability in New York could render itself effectively judgment-proof even where no fraud occurs. In fact, we reject any formal distinction between cases involving statutory and de facto mergers, or corporate alter egos and reorganizations, on the one hand, and cases involving the

wholesale assumption of assets and liabilities in a way that would needlessly redound to the benefit of wrongdoers, on the other. Such an outcome would not further the goal of "substantial justice."

* * *

Although SGBL doubtless faces a burden in being required to litigate in New York, it is a manageable and not unfair burden, and all of the remaining "reasonableness factors" favor Plaintiffs. We conclude that the exercise of specific personal jurisdiction over SGBL in New York does not offend traditional notions of fair play and substantial justice.

**CONCLUSION**

Under New York law, SGBL's purchase of LCB's assets and liabilities means that it also acquired LCB's jurisdictional status. SGBL's decision to enter into the Agreement satisfies the "purposeful availment" requirement of our due process assessment; it was foreseeable at the time of purchase that the Agreement would render SGBL subject to suit in New York on the claims asserted here; and considerations of fair play and substantial justice support the district court's exercise of specific personal jurisdiction over SGBL in New York.

We therefore conclude that New York law allows and due process permits the exercise of specific personal jurisdiction over SGBL as LCB's successor.

For the foregoing reasons, we **VACATE** the order of the district court dismissing this action and **REMAND** for further proceedings consistent with this decision.